### THE HELEN G. MOSELEY.

#### MOSELEY et al. v. ROB. M. SLOMAN & CO.

(Circuit Court of Appeals, Second Circuit. January 13, 1904.)

#### Nos. 72, 73.

1. COLLISION—STEAMER AND SCHOONER CROSSING—INEFFICIENT LOOKOUT.

A collision occurred at sea in the night between a steamer and a schooner on crossing courses. The night was clear and the wind light, but it was shown that the schooner had steerageway, and that her lights were burning and of more than usual size. While the evidence as to her course was conflicting as between the witnesses from the two vessels, it did not sustain the contention of the steamer that she was on such a course that her lights could not be seen in time to have prevented the collision, although the steamer's lookout and three of her officers testified that they were watching, and did not see the lights until immediately before the collision. *Held*, that, under such evidence, the steamer, as the burdened vessel, must be held solely in fault.

2. SAME—INCONSISTENT TESTIMONY OF SAME WITNESSES.

Where the testimony of the crew of a schooner as to her course before and at the time of a collision, and as to the bearing of the light of an approaching steamer with which the collision occurred, cannot be correct in both particulars, or the collision could not have occurred, assuming the witnesses to be honest, the testimony as to the course is entitled to preference, as less liable to error.

Appeals from the District Court of the United States for the Eastern District of New York.

These causes come here upon appeals from decrees of the District Court, Eastern District of New York, holding the steamer Albano solely in fault for a collision with the schooner Helen G. Moseley, which occurred about 1 a. m. September 10, 1901, off Tucker Beach, N. J.; the steamer being bound from New York to Newport News, and the schooner from Fernandina to New York. The night was dark, but good and clear for seeing lights. The wind was light from about the southwest. The day before, there had been a strong breeze from the N. E., and there was still an easterly sea bearing in. The Albano was about 380 feet long, and her bridge was located about amidships. The schooner was three-masted, about 150 feet long, and 566 tons register. The opinion of the District Court is reported in 117 Fed. 760, and may be referred to for facts not hereinafter restated. The testimony of the most important witnesses was taken by deposition.

Harrington Putnam, for appellants.
Edward E. Blodgett, for appellees.

Before WALLACE, LACOMBE, and COXE, Circuit Judges.

LACOMBE, Circuit Judge. The claim of the schooner is that she was on a course of N. E. by E. (having changed to that course from a N. E. one about midnight), with the wind directly astern, and sailing with her sails winged out—i. e., head sails trimmed in, foresail hard amidships, mainsail on the port side, and spanker on the starboard side—and going two or three knots. A bright light was first seen by the lookout, and reported to the mate, who was in charge of the navigation, and was at once seen by him. It bore about three points on the port bow, and a little later the green side light of the steamer was seen bearing in about the same direction. It was expected that the steamer would change her course and keep clear, and the schooner held her course. The steamer came on without apparent change, and collided with the schooner, striking her on the port bow at an angle of about four points.

The steamer's story is that she was on a course S. W. by S. when the lookout reported a red light ahead. The second officer, who was in charge of the navigation, and others on the bridge at the same time, saw the loom of sails slightly on the starboard bow, but very close aboard, with a small, dim, red light, apparently heading to the southeastward. The Albano's helm was instantly put hard astarboard, her engines stopped, and put full speed astern; but so close was the schooner that the wheel was barely over, and the Albano had not swung off as much as a point, when her starboard bow was struck a square blow by the schooner's stem.

From the narrative of neither side is there any warrant for holding this to be a case of inevitable accident. There was fault somewhere. The Albano, being a vessel under steam, was bound to keep out of the way of the schooner under sail, and, having failed to do so, can excuse herself only by showing fault on the part of the schooner. Manifestly the proximate cause of the accident was the failure of those on the steamer to discover the red light of the schooner until she was within one length of them. Judging from the event, the navigator of the steamer would have used better judgment, had he at once ported to the schooner's red light, but that bit of navigation came so close to the collision that it need not be considered. The brief moment left in which to navigate was primarily responsible, and its briefness was the result of failure to make out the schooner earlier. The second officer was in charge of the steamer's navigation. The boatswain was on the bridge with him, performing there the duties of a junior officer. The quartermaster had served in the German navy; the lookout, in the German army. All were experienced men, and had undergone special eyesight examination. The captain was also on deck, but he had returned so recently after a momentary absence in the chartroom to work out an observation, taken to ascertain location off shore, that he should not be counted among the watchers for lights. It is difficult to understand how such a body of officers and men, at the beginning of their watch, could have failed

to see the red light earlier, if it had been visible. The circumstance that it was lower than the plane of observation of the lookouts, that there was still an easterly sea, that several other lights had recently been seen and kept under observation, thus tending to distract attention, seem hardly sufficient to account for a temporary aberration, lasting some minutes, on the part of four competent observers simultaneously. Nevertheless individual aberrations of sight and attention do occur, even among the ordinarily careful, and, however enormous the odds may be against such a simultaneous occurrence among four persons, the combination is possible. Therefore, under well-settled principles, unless there can be ·shown some cause, due to the schooner, why her red light was not shown to the steamer until in the very jaws of the collision, the conclusion must be that the steamer was in fault.

When the libel was filed and the proofs were taken, it was intimated that the red light had not been lit until just before the steamer sighted it; and effort was also made to show that the light was a dim one, of insufficient size. The testimony, however, shows conclusively that the light was a proper one, of more than regulation size; was properly set and properly burning. This testimony· need not be discussed, because on this appeal no question is made of the sufficiency of the light. Nor is there any contention in this court that either the head sails or anything else obscured or hid the light. The only proposition now relied on by the steamer is that the schooner was heading S. E., or so far to the south of east that the steamer was in reality approaching her abaft the range of her lights, and that some slant of wind or a freshening land breeze brought the schooner far enough around to the east again just before collision to show her regulation side light—not its full surface flame, but only a glimmer of the edge rays shining backward as the surge of the sea swung the schooner over to port. If this were so, not only was the failure to see her red light not a fault, but the schooner herself would be in fault for not exhibiting a flare-up light or a torch to the vessel approaching abaft her beam.

The only question to be examined, therefore, is, on what course was the schooner sailing? She insists it was N. E. by E. The steamer contends that it was S. E. The District Court reached the conclusion that her heading was "E. by S., or E. S. E., or E. S. E. ½ S." Since neither of these three courses would bring the steamer abaft the range of the schooner's lights, the District Court held her in fault for failure to discover the red light sooner.

There is a wide discrepancy—seven points, nearly a right angle— between the courses contended for by the respective parties. Such a difference of course in a vessel propelled by sails might be expected, under certain conditions of wind, to produce changes in the position of the sails. The first thing to do is to see which of the suggested courses most nearly harmonizes with the testimony in the case. Some facts are here undisputed. The course of the steamer was S. W. by S. The schooner had steerageway and was going about two knots. Her witnesses so testify, and the second officer and the captain of the steamer both admit that she had way enough

for steering. Whatever may have been the condition of the weather earlier in the night, there is no proof to sustain the contention made in argument that just before the collision the schooner was drifting, not sailing. As the vessels approached, the schooner bore on the starboard bow of the steamer. All the witnesses from the schooner say they saw the Albano's green light, and all the witnesses from the Albano saw the schooner's red light on their starboard bow.

A course of S. E. would be an extraordinary one for a sailing vessel with a southwesterly wind, bound from where she was to New York. Her correct course would be, as she claimed, about N. E. by E. There should be a distinct weight of persuasive evidence to warrant the conclusion that she was so far off her course as the steamer contends she was. The District Judge has discussed the evidence, and made careful calculations of the headings of the vessels at different times. It is not necessary to quote. His opinion may be consulted. The calculations are accurate if all the factors which enter into them are correctly found. It was assumed, or, rather, deduced from disputed testimony, that the angle of collision was nearly a right angle—fully seven points—and that the steamer, when sighted by the schooner, bore three points on the latter's port bow.

As to the angle of collision, all the witnesses from the steamer give it as about seven points, or nearly a right angle. It should be noted, however, that none of them saw the schooner until a few seconds before collision; that they then believed she was crossing their own course at about a right angle; that this belief was induced by the loom of her sails as they came into view, apparently on the port side of the schooner. "I was right into them broadside," says the second officer of the Albano. "* * * I was of opinion that she was bound to the southward." It may be assumed that some, at least, of the witnesses from the steamer, deduced their conclusion that the heading of the schooner at collision was such as to make a seven-point angle, from the appearance of her sails spread broadside in front of them. The master of the schooner and one of the watch below, both of whom hurried on deck in response to the warning of an imminent collision, agree with the steamer's witnesses. The view of the schooner's wheelsman was obscured by the sails, and he gives no estimate, while her mate and lookout give the angle at three to four points; and, of the two surveyors who examined the wound, one. called by the steamer, admitted the blow might have been an angling one, and the other, called by the schooner, estimated the angle of collision at two to three points. The testimony from the schooner is uniform that she was winged out during the former watch, which ended at midnight. This is inherently probable, because, with a southwesterly wind, it was proper navigation to make her destination. Moreover, her testimony is to the effect that during that watch her main boom and spanker boom were both fastened out with tackles, so that the booms should not swing back and forth. This also was proper seamanship, and the testimony is inherently probable. Her witnesses also testify that those tackles were not touched after the new watch began, down to the time of collision. Inasmuch as the wind did not shift more than a point during this

period, there is no conceivable reason why the tackles should have· been disturbed; and we are fully persuaded that at the time of collision, whatever her heading may have been—whether it was still . nearly N. E. by E., or had dropped down more to the southward— her after sails were still winged out. Appellants' counsel has inserted in his brief two lithographs which admirably illustrate the different appearances presented by the sails of a schooner when she looms through the darkness of night, at an angle of about two points, and also at a right angle. The second one represents a vessel on the starboard tack with her sails to port and trimmed in. If the obscurity were a shade greater, and the after sails were winged out, so that the observer saw them end on, the effect would be different; and there is some weight in the argument of the appellees that the observers from the Albano might, in the darkness, have been deceived by the winged-out sails, towards which they seemed to be approaching broadside, into the belief that they were encountering a vessel crossing their course at right angles. The weight of direct evidence is in favor of the conclusion that the collision was at a seven-point angle, but not so strongly as to require the discarding of some other proposition inconsistent with such result, but established by more convincing evidence.

As to the bearing of the steamer: The District Judge says:

"The crew of the schooner state that she was headed N. E. by E.; that the steamer's white light, and later her green light, bore three points on the schooner's port bow; and that the steamer did not change her course. With such heading of the schooner and bearing of the steamer, the accident could not have happened, and the red light not the green light of the steamer should have appeared."

This is correct, and is made very clear by a diagram in appellants' brief. But it is certain that it was the steamer's green light which appeared. Not only do the schooner's witnesses so testify, but all the steamer's witnesses concur in the statement that the schooner appeared off the Albano's starboard bow. It is quite plain that the statements of the schooner as to both course and bearing cannot stand. Which one is to be rejected? Apparently the one which is most liable to error, and whose elimination will make the harmonizing of the remaining testimony most easy. As to the course of N. E. by E., the lookout, Ommundsen, who came on watch at 12 o'clock, merely says the schooner was going before the wind. Normand, who had steered in the prior watch N. E. by E., turned the wheel over at 12 o'clock to Hornsley, and gave him that course. Hornsley, the wheelsman, said he was given this course of N. E. by E., and that he steered it. Keiley, the mate, says that when he came on deck, at 12 o'clock, he "altered the course to N. E. by E.," and that such course was held.

As to the bearing of the steamer's light: Ommundsen, lookout, says "it was pretty near ahead; about three points on the port bow." Hornsley says it was "about two or three points on the port bow." Keiley says "about three points on the port bow." Now, in the testimony as to course, assuming the witnesses to be honest, there is one source of error, viz., defective memory. The witnesses testify

to facts, not to opinions. The man who gave an order, the man who heard it, the man who watched the compass card, all testify to their recollection of absolute facts. On the other hand, the testimony as to bearings is exposed not only to error resulting from imperfect memory, but also to error from careless or unskillful estimates. The witnesses testify to their recollection of an opinion formed by them, which opinion may not originally have been an accurate one. Upon the whole, it might well be supposed that the schooner's testimony as to her course should prevail over her testimony as to the varying estimates of her watch as to bearings. And this is confirmed by a bit of testimony given by the mate. It was brought out on cross-examination that, when he first made the steamer's light, he took its compass bearing, and found it "just about N. E." That would be one point off the port bow, and with that bearing the collision might have happened as the schooner's witnesses describe it, except that the angle of collision would be much acuter than seven points.

On the whole, we find great force in the argument that the angle was not more than three points, and that the schooner's course was as she claims. Such findings would reconcile the other testimony in the case. But we need not go so far. We are entirely satisfied that the evidence fails to show that the schooner was heading so much to the south of her course as to obscure the steamer's view of her red light. That is the conclusion reached by the District Judge.

The decrees are affirmed, with a single bill of costs and interest on the decree against the Albano.